UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PARIMALADEVI JEGANATHAN,<br><br>                Plaintiff,<br><br>           - against --<br><br>TAMIL ARASI KRISHNAN and<br>DANISH KUMAR,<br><br>                Defendants. | No.<br><br>COMPLAINT<br><br>Jury Demanded |

## PRELIMINARY STATEMENT

Plaintiff, Parimaladevi Jeganathan ("Ms. Jeganathan" or "Plaintiff"), by and through her counsel, The Legal Aid Society and Crowell & Moring LLP, for her Complaint against Defendants, Tamil Arasi Krishnan ("Defendant Krishnan") and Danish Kumar ("Defendant Kumar"), respectfully alleges upon knowledge as to herself and her acts, and upon information and belief as to all other matters, as follows:

1.      Ms. Jeganathan worked in the household of Defendant Krishnan in the United States as a domestic worker for approximately one year.

2.      Defendants knowingly and willfully lured Ms. Jeganathan from Sri Lanka to Malaysia, and then to the United States, with false promises of a wage of $9.75 per hour, overtime pay, and working conditions otherwise in accordance with United States law.

3.      Instead, Defendant Krishnan confiscated Ms. Jeganathan's passport and subjected her to forced labor and psychological coercion.

1

4.      While working for Defendant Krishnan, Ms. Jeganathan was forced to work approximately fifteen-hour days with few breaks for approximately $0.58-$1.71 per hour, when she was paid at all.

5.      Among other threats, Defendant Krishnan told Ms. Jeganathan that it was not safe for Ms. Jeganathan to leave the house because "black people" would attack her.  In addition, when Ms. Jeganathan asked for her wages, Defendant Krishnan also told Ms. Jeganathan that she would be sent back to Sri Lanka.

6.      When Ms. Jeganathan inquired about the terms of her employment, Defendant Krishnan told Ms. Jeganathan that their employment relationship would be governed by Malaysian rules and not those of the United States.

7.      Ms. Jeganathan seeks redress for harm caused to her by Defendants' unlawful conduct under the Trafficking Victims Protection Reauthorization Act and Defendant Krishnan's conduct under the Fair Labor Standards Act, New York State law, and common law.

## JURISDICTION AND VENUE

8.      This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1351, 29 U.S.C. § 201 *et seq.*, and 18 U.S.C. § 1595(a).

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because these claims form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this district.

NYACTIVE-15397936.1

11.     This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

<strong><u>PARTIES</u></strong>

12.     Plaintiff Parimaladevi Jeganathan is a citizen of Sri Lanka.

13.     At the outset of the events that gave rise to this action, Ms. Jeganathan lived with her family in Sri Lanka.  In January of 2013, Ms. Jeganathan began working for Defendants in their home in Malaysia.  In March of 2013, Ms. Jeganathan was admitted to the United States on an A-3 visa, which is available for attendants, servants, personal employees, and members of the immediate families of consular officials such as Defendant Krishnan. 8 U.S.C. § 1101(a)(15)(A)(iii).  Ms. Jeganathan then resided in New York, New York at all other times relevant to this action, and continues to reside in New York, New York.

14.     At all times relevant to this action, Ms. Jeganathan worked for Defendants in their residence in Kajang, Malaysia and for Defendant Krishnan in her residence in New York, New York.

15.     At all times relevant to this action, Ms. Jeganathan was a domestic worker of Defendant Krishnan as defined by the Fair Labor Standards Act and New York Labor Law.

16.     At all times relevant to this action, Ms. Jeganathan was an employee of Defendant Krishnan, and not of any government agency or authority.

17.     Upon information and belief, at all times relevant to this action, Defendant Krishnan worked for the government of Malaysia, including serving as a Consul at the Consulate General of Malaysia in New York.

18.     At all times relevant to this action, Defendants resided in Kajang, Malaysia or New York, New York.

NYACTIVE-15397936.1

19.     Upon information and belief, Defendant Krishnan returned to Malaysia in approximately March of 2014 and currently resides in Malaysia.

## STATEMENT OF FACTS

20.     Ms. Jeganathan was born in Sri Lanka.

21.     Ms. Jeganathan is Tamil.

22.     Due to ongoing violence between Sinhalese and Tamil ethnic groups in Sri Lanka, Ms. Jeganathan was forced to relocate with her family within Sri Lanka as a child.  Ms. Jeganathan has personally witnessed violence against Tamil people in Sri Lanka.

23.     Ms. Jeganathan eventually sought work abroad with the hope of finding better employment opportunities outside of Sri Lanka to support her parents and siblings.

### Recruitment and Trafficking to the United States

24.     Defendants arranged for and carried out Ms. Jeganathan's transport to the United States, using fraud and deception to convince Ms. Jeganathan to agree to come to the United States and to obtain a visa for Ms. Jeganathan.

25.     Sri Lanka is a source country for human trafficking.  Sri Lanka: Tier 2 Watch List, U.S. Dep't of State, Trafficking in Persons Report 315-16 (2015);[1] Sri Lanka (Tier 2 Watch List), U.S. Dep't of State, Trafficking in Persons Report 340-42 (2013).[2]

26.     In the summer of 2012, Ms. Jeganathan agreed to work in Defendants' home in Malaysia where Defendants lived with their son and Defendant Kumar's parents.

27.     On or about January 9, 2013, Ms. Jeganathan traveled from Sri Lanka to Malaysia to begin work for Defendants.

---

[1] *Available at* http://www.state.gov/documents/organization/245365.pdf.
[2] *Available at* http://www.state.gov/documents/organization/210737.pdf.

28.     In Malaysia, Ms. Jeganathan worked approximately fifteen-hour days with limited breaks taking care of Defendants' child and completing domestic work for the family of five, including Defendants Krishnan and Kumar, their son, and Defendant Kumar's parents.

29.     Ms. Jeganathan believed she would have one day off per week.  However, when she asked Defendant Krishnan for the day off, Defendant Krishnan told her to work instead of taking days off, promising that she would be paid for her extra time.  Ms. Jeganathan agreed, but never received any extra money for this work. Defendant Krishnan kept Ms. Jeganathan's passport in her custody while she worked in Malaysia.

30.     The day after Ms. Jeganathan arrived in Malaysia, Defendant Krishnan told Ms. Jeganathan that Defendant Krishnan would be traveling to New York to work as a Consul at the Malaysian Consulate beginning on or about January 19, 2013.  Defendant Krishnan told Ms. Jeganathan that Defendant Krishnan would obtain a visa for Ms. Jeganathan from the U.S. Embassy, and that Ms. Jeganathan would then travel to the United States to work in Defendant Krishnan's New York home.

31.     Defendant Krishnan gave Ms. Jeganathan a contract describing Ms. Jeganathan's work in New York. Defendant Krishnan told Ms. Jeganathan to sign the contract on or about January 10, 2013.

32.     Ms. Jeganathan was nervous to sign the contract because the United States was further away from her home than any place she had ever worked.  However, she believed that she could make more money in the United States working for Defendant Krishnan and thought her working conditions in the United States would be better as per the terms of the contract.

33.     The contract was between Defendant Krishnan and Ms. Jeganathan.  It stated that Defendant Krishnan would employ Ms. Jeganathan as a "domestic servant" between January

5

2013 and January 2017.  The contract specified a wage rate of $9.40 per hour for a forty-hour

work week and included ten days paid vacation, five sick days, and round trip airfare between

the United States and Ms. Jeganathan's country of residence, among other terms.  The contract

was written in English, Ms. Jeganathan's third language.

34.     On information and belief, Defendant Krishnan submitted this contract to the U.S.

Embassy in Malaysia as part of an application for an A-3 visa for Ms. Jeganathan.

35.     In Malaysia, Ms. Jeganathan worked long hours and did not receive days off.

However, she understood that, in the United States, she would be working only forty hours per

week.

36.     In or about January 2013, Ms. Jeganathan attended an interview for her visa at the

U.S. Embassy in Malaysia.  On information and belief, in or about that same month, the U.S.

Embassy in Malaysia contacted Defendant Krishnan to tell her that they had denied Ms.

Jeganathan's visa.

37.     In the later part of January of 2013, Defendant Krishnan traveled to the United

States without Ms. Jeganathan.  Ms. Jeganathan remained in Malaysia, serving Defendant

Kumar, Defendants' son, and Defendant Kumar's parents.

38.     On information and belief, Defendant Krishnan continued to arrange for Ms.

Jeganathan's arrival from the United States.  After Defendant Krishnan left for the United States,

Defendant Kumar presented Ms. Jeganathan with a second contract ("Second Contract") that was

already signed by Defendant Krishnan. Ex. 1, Second Contract.

39.     This contract was very similar to the first contract, but it included a pay rate of

$9.75 per hour and additional terms, including overtime pay.  Unlike the first contract, the

Second Contract specified that Defendant Krishnan would pay Ms. Jeganathan using a check or

6

electronic transfer to Ms. Jeganathan's bank account; that Defendant Krishnan would not withhold Ms. Jeganathan's passport; and that Defendant Krishnan would not require Ms. Jeganathan to remain at her workplace when Ms. Jeganathan was not paid to remain there.

40.     Defendant Krishnan called Malaysia from New York to discuss the Second Contract via Skype and telephone.  Defendant Krishnan described the terms of the agreement to Ms. Jeganathan, and then instructed Ms. Jeganathan to read and sign the document.  Defendant Kumar presented Ms. Jeganathan with the contract signed by Defendant Krishnan for her signature.

41.     On information and belief, Defendant Krishnan or Defendant Kumar submitted the Second Contract to the U.S. Embassy in Malaysia as part of an application for an A-3 visa for Ms. Jeganathan.

42.     Prior to Ms. Jeganathan's second visa interview, Defendant Krishnan told Ms. Jeganathan over the phone from the United States how to answer the interview questions, including that she should answer the questions based on the contract they had signed.  Defendant Kumar took Ms. Jeganathan to the interview at the U.S. Embassy.  At the interview, Ms. Jeganathan did as she was told and believed she was telling the truth because she thought that Defendant Krishnan would follow the terms of the Second Contract in the United States.

43.     The U.S. Embassy gave Ms. Jeganathan a pamphlet on human trafficking during the second interview, which Ms. Jeganathan kept.

44.     After the second interview, Ms. Jeganathan's A-3 visa was approved.

45.     On information and belief, Defendant Krishnan and/or Defendant Kumar arranged for Ms. Jeganathan's flight from Malaysia to the United States.

46.     Ms. Jeganathan traveled to the United States with Defendant Kumar, his mother, and Defendants' son, who was approximately two and a half years old at the time. Ms. Jeganathan arrived in New York on or about March 10, 2013.

**Forced Labor, Abuse, and Isolation in the United States**

47.     Once in the United States, Defendant Krishnan willfully and intentionally obtained Ms. Jeganathan's forced labor through coercion, fraud, threats, and isolation. Defendant Krishnan's actions were intended to minimize Ms. Jeganathan's contact with the outside world and lead her to believe that she must continue to work for Defendant Krishnan, risk harm if she left the apartment, or be returned to her home country.

48.     Soon after arriving in the United States, Defendant Krishnan confiscated Ms. Jeganathan's passport.  Defendant Krishnan told Ms. Jeganathan that Defendant Krishnan needed the passport so that the Malaysian Consulate would give Defendant Krishnan money for food for Ms. Jeganathan.  Ms. Jeganathan never again had custody of her passport during her employment with Defendants.

49.     In New York, Ms. Jeganathan lived with Defendants' family in their three-bedroom apartment next to the Malaysian Consulate.  On or about the end of March, Defendant Kumar returned to Malaysia. Defendant Kumar's mother returned to Malaysia on or about the end of April.  Ms. Jeganathan continued to reside with Defendant Krishnan and her son for the remainder of her time working for Defendant Krishnan.

50.     Ms. Jeganathan generally worked for Defendant Krishnan from approximately 6:30 a.m. (7:30 a.m. on weekends) until 9:45 p.m. or 10:00 p.m.

51.     An average day of work for Ms. Jeganathan in Defendant Krishnan's New York home from May 2013 until October 2013 included, among other tasks:

8

    a.      Sweeping and mopping the floors before the family woke up;

    b.      Preparing coffee, tea, and breakfast by 7:30 a.m.;

    c.      Taking care of Defendants' child when he woke up at 7:45 a.m. or 8:00 a.m. and being responsible for him until he went to bed;

    d.      Preparing lunch for Defendant Krishnan when she returned home from work around 12:15 p.m. or 12:30 p.m.;

    e.      Cleaning the kitchen and washing dishes;

    f.      Watching, playing with, and otherwise taking care of Defendants' child;

    g.      Cleaning and doing laundry, including laundry that Defendant Krishnan required Ms. Jeganathan to do by hand;

    h.      Preparing dinner ingredients;

    i.      Feeding Defendants' child dinner; and

    j.      Preparing milk at night when Defendants' child woke up.

52.      Ms. Jeganathan did not have much time to herself during the day; she was generally preparing meals, cleaning, taking care of Defendants' child, or completing other tasks.

53.      On weekends, Ms. Jeganathan helped to prepare bigger meals at the request of Defendant Krishnan and would complete larger chores, such as cleaning windows, in addition to Ms. Jeganathan's regular duties.

54.      Defendant Krishnan took many actions to isolate Ms. Jeganathan and ensure that Ms. Jeganathan left the house only rarely.

55.      Defendant Krishnan told Ms. Jeganathan that Defendant Krishnan could come home from the Consulate, which was next to the apartment, at any time and check on Ms. Jeganathan.

NYACTIVE-15397936.1

56.     Defendant Krishnan told Ms. Jeganathan that Consulate employees were usually in the neighborhood and would see Ms. Jeganathan if she left.

57.     Defendant Krishnan told Ms. Jeganathan that "black people" would "do something to her" if Ms. Jeganathan left the house.  Ms. Jeganathan thought this meant that she would be physically harmed in some way.

58.     Defendant Krishnan said that if Ms. Jeganathan did leave and something bad happened to her, Defendant Krishnan would not help Ms. Jeganathan.  Defendant Krishnan told Ms. Jeganathan that she was not Defendant Krishnan's responsibility and that she was "nobody" in the United States.

59.     Defendant Krishnan did not allow Ms. Jeganathan to have a copy of the apartment key. Instead, a key was left on the dining room table.  Ms. Jeganathan was only allowed to use the key if she needed to leave the apartment to do small errands.

60.     Defendant Krishnan told Ms. Jeganathan that she had asked both the apartment's doorman and Consulate security guards to monitor Ms. Jeganathan's movement.  A Consulate security guard also told Ms. Jeganathan that Defendant Krishnan had requested that they watch her.

61.     Defendant Krishnan would periodically call Ms. Jeganathan at the house during the day so that if Ms. Jeganathan was not at home, Defendant Krishnan would know.

62.     During the summer of 2013, Ms. Jeganathan began asking for time off. Defendant Krishnan denied the request.

63.     All of Defendant Krishnan's psychological manipulation described above caused Ms. Jeganathan to fear for her safety if she left the apartment, either from people outside the

home or from Defendant Krishnan if Defendant Krishnan were to find out that Ms. Jeganathan had left.

64.     Ms. Jeganathan was also financially dependent on Defendant Krishnan. Defendant Krishnan told Ms. Jeganathan that she could buy very little in the United States with what Defendant Krishnan paid her, and Defendant Krishnan prohibited Ms. Jeganathan from opening her own bank account.

65.     In October of 2013, Defendant Krishnan and her son left for vacation.  Ms. Jeganathan remained in the apartment and Defendant Krishnan required that she refrain from venturing outside the home for anything but necessities.  Defendant Krishnan told Ms. Jeganathan to keep the house clean as usual while she was gone.  Defendant Krishnan gave Ms. Jeganathan a small amount of money on which to live during this period and called periodically while on vacation.  On information and belief, Defendant Krishnan did so to make sure that Ms. Jeganathan remained in the house.

66.     While Defendant Krishnan was on vacation, Ms. Jeganathan believed that Consulate employees and doormen were continuing to monitor her comings and goings during Defendant Krishnan's absence.  She remained fearful of venturing outside alone.  As a result, Ms. Jeganathan only left the house on limited occasions.

67.     After Defendant Krishnan and her son returned from vacation, Ms. Jeganathan's regular schedule resumed.

68.     In November and December 2013, after repeated requests, Defendant Krishnan allowed Ms. Jeganathan to attend Christian church services a few times.

69.     In February 2014, Defendants' child began school two mornings per week.  Ms. Jeganathan would bring him to school for a 9:00 a.m. start time. Defendant Krishnan told Ms.

NYACTIVE-15397936.1

Jeganathan to stay at the school during the class.  Defendant Krishnan would meet Ms. Jeganathan at 11:30 a.m. or 12:00 p.m., and together they would walk Defendants' child home from school for lunch.  Defendant Krishnan told Ms. Jeganathan that she should say hello to other people, but that she should not say anything else.

70.     Aside from the changes mentioned above, from October 2013 until Ms. Jeganathan's escape in March 2014, her schedule remained substantially the same as described in paragraph 51.

## Violations of the Employment Laws and Breach of Contract

71.     Ms. Jeganathan was not paid at all for the last month of work in the United States.  All other months, she was paid approximately $250 or $275 per month.  Defendant Krishnan gave her a receipt for these payments.  Ms. Jeganathan kept approximately $40 or $50 per month for herself and sent the rest home to her family in Sri Lanka.

72.     Ms. Jeganathan realized that she was not being paid according to the terms of the Second Contract.  However, whenever Ms. Jeganathan asked about her wages, Defendant Krishnan told Ms. Jeganathan that Defendant Krishnan followed Malaysian rules, not United States rules.

73.     When Ms. Jeganathan asked about her salary, Defendant Krishnan said, "if you ask me about this, I will send you back to your country straight away."  Ms. Jeganathan was scared to return to Sri Lanka because of the ongoing violence facing Tamil peoples.

74.     At all times relevant to this action, Defendant Krishnan had the power to hire and fire Ms. Jeganathan.

75.     At all times relevant to this action, Defendant Krishnan had the power to control Ms. Jeganathan's schedule.

NYACTIVE-15397936.1

76.    At all times relevant to this action, Defendant Krishnan had the power to supervise Ms. Jeganathan.

77.    At all times relevant to this action, Defendant Krishnan had the power to control Ms. Jeganathan's working conditions.

78.    At all times relevant to this action, Defendant Krishnan had the power to determine the rate and method of payment of Ms. Jeganathan's wages.

79.    At all times relevant to this action, Defendant Krishnan employed Ms. Jeganathan as defined under the employment laws because Defendant Krishnan acted directly or indirectly in the interest of an employer in relation to Ms. Jeganathan, her employee.  29 U.S.C. § 203(d); N.Y. Lab. Law § 190.

80.    At all times relevant to this action, Defendant Krishnan employed Ms. Jeganathan as defined under the employment laws because Defendant Krishnan suffered or permitted her to work.  29 U.S.C. § 203(g); N.Y. Lab. Law § 190.

81.    Defendant Krishnan did not pay Ms. Jeganathan the statutory federal minimum wage rate of $7.25 per hour or the statutory state minimum wage rate of $7.25 in 2013 and $8.00 in 2014.  29 U.S.C. § 206(a), (f); N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.1.

82.    Defendant Krishnan did not pay Ms. Jeganathan the hourly rate of $9.75 per hour as set forth in the Second Contract.

83.    Defendant Krishnan did not pay Ms. Jeganathan the required overtime pay for work hours in excess of forty-four hours per week as required by New York State law.  N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.2.

84.    Defendant Krishnan did not pay Ms. Jeganathan spread-of-hours pay as required under New York State law.  N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.4.

NYACTIVE:-15397936.1

85.     Spread-of-hours pay is an additional hour of pay for those days in which the interval between the time Ms. Jeganathan started and ended work was more than ten hours, where two shifts on the same day stretch for a period longer than ten hours from the start of the first shift through the end of the last shift, regardless of any break time, or where both situations occur.

86.     Defendant Krishnan did not comply with the terms of the Second Contract, which, upon information and belief, were required to obtain Ms. Jeganathan's visa.  Salary, Contracts and Employer Obligations, 9 Foreign Affairs Manual § 402.3-9(B)(4) (2016).[3]  For example, Defendant Krishnan did not pay Ms. Jeganathan the minimum wage, did not pay Ms. Jeganathan overtime pay, and did not pay Ms. Jeganathan with a check or electronic transfer.

87.     Upon information and belief, Defendant Krishnan did not maintain proper records for Ms. Jeganathan's work schedule and pay.  Defendant Krishnan did not provide Ms. Jeganathan with wage statements as required by state law.

88.     At all times relevant to this action, Defendant Krishnan did not post any information in the home indicating the laws regarding the minimum wage and overtime pay, or otherwise provide Ms. Jeganathan any information about her rights under the federal or state employment laws.

89.     Defendant Krishnan's failure to inform Ms. Jeganathan about her rights was willful and/or intentional.

**Escape**

90.     In February or March 2014, Defendant Krishnan told Ms. Jeganathan that her visa had expired, which made Ms. Jeganathan even more frightened of leaving the apartment because

---

[3] *Available at* https://fam.state.gov/FAM/09FAM/09FAM040203.html#M402_3_5_C.

14

she feared being caught by authorities.  Ms. Jeganathan asked Defendant Krishnan to renew her visa, but Defendant Krishnan said it was too expensive to renew.  Defendant Krishnan told Ms. Jeganathan that Ms. Jeganathan would work for three and a half years and would then return with Defendant Krishnan to Malaysia where Ms. Jeganathan would continue to work for Defendant Krishnan.  Defendant Krishnan told Ms. Jeganathan that her only other option was to return to Sri Lanka.

91.     After Ms. Jeganathan learned that Defendant Krishnan was not going to renew her visa, Ms. Jeganathan concluded that she needed to leave the apartment.  However, Ms. Jeganathan was afraid of what Defendant Krishnan would do to her if she tried to leave the apartment on her own.

92.     Ms. Jeganathan still had the pamphlet about Human Trafficking provided by the U.S. Embassy in Malaysia.  She called the hotline number on the pamphlet and explained her situation.

93.     Through the hotline, Ms. Jeganathan planned her escape with the United States Federal Bureau of Investigation ("FBI").  Ms. Jeganathan asked that the FBI agents come to the apartment to get her.

94.     On or about March 6, 2014, FBI agents came to the apartment and Ms. Jeganathan escaped with them.  Fearing that Defendant Krishnan would accuse Ms. Jeganathan of stealing valuables, Ms. Jeganathan refused to leave until Defendant Krishnan inspected her bags in front of the FBI agents.

95.     An FBI agent recovered Ms. Jeganathan's passport from the Consulate where Defendant Krishnan kept it.

96.     All Defendant Krishnan's conduct as described above was willful and intentional.

15

## FIRST CLAIM FOR RELIEF

### Involuntary Servitude in Violation of 18 U.S.C. §§ 1584, 1595

### (Against Both Defendants)

97.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98.    Under 18 U.S.C. § 1584(a), it is unlawful to "knowingly and willfully hold[] to involuntary servitude . . . or bring[] within the United States any person so held."

99.    "[I]nvoluntary servitude includes a condition of servitude induced by means of . . . any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or . . . the abuse or threatened abuse of the legal process." 22 U.S.C. § 7102(6).

100.    As alleged herein, Defendant Krishnan knowingly and willfully subjected Ms. Jeganathan to a condition of involuntary servitude for approximately one year in the United States in violation of 18 U.S.C. § 1584 that led her to believe she would suffer serious physical, financial, and/or legal harm if she did not comply.

101.    Both Defendant Krishnan and Defendant Kumar abused the legal process to obtain Ms. Jeganathan's labor by procuring and presenting fraudulent documents to the U.S. Embassy to obtain her visa.

102.    As part of their scheme to subject Ms. Jeganathan to involuntary servitude, Defendant Krishnan persuaded Ms. Jeganathan to enter the United States by falsely representing that Ms. Jeganathan's employment would be subject to the Second Contract.  Defendant Krishnan falsely represented that Ms. Jeganathan would receive a pay rate of $9.75 per hour, that Defendant Krishnan would not withhold Ms. Jeganathan's passport, and that Defendant Krishnan

16

would not require Ms. Jeganathan to remain at her workplace when Ms. Jeganathan was not paid to remain there.

103.     Defendant Krishnan and Defendant Kumar arranged for Ms. Jeganathan's transport and Defendant Kumar brought Ms. Jeganathan to the United States for the purpose of involuntary servitude.

104.     In order to maintain Ms. Jeganathan's servitude, among other methods, Defendant Krishnan abused the legal process by threatening to endanger Ms. Jeganathan's immigration status in the United States and allowing Ms. Jeganathan's passport to expire.

105.     This coercion caused Ms. Jeganathan to reasonably believe that she had no choice but to continue working for Defendant Krishnan.

106.     Ms. Jeganathan brings this claim for relief pursuant to the private right of action granted by 18 U.S.C. § 1595.

107.     Defendant Krishnan and Defendant Kumar directly and proximately caused harm to Ms. Jeganathan.

108.     Ms. Jeganathan is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Forced Labor in Violation of 18 U.S.C. §§ 1589, 1595

### (Against Both Defendants)

109.  Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.  Under 18 U.S.C. § 1589(a), it is unlawful to "knowingly provid[e] or obtain[] the labor or services of a person . . . (1) by means of force, threats of force, physical restraint, or

threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

111.   As alleged herein, Defendant Krishnan and Defendant Kumar knowingly provided or obtained Ms. Jeganathan's services as a domestic worker by abuse of law or legal process, and Defendant Krishnan carried out a scheme to make Ms. Jeganathan believe that she would suffer serious harm if she did not continue to provide services to Defendant Krishnan.

112.   As part of the scheme to subject Ms. Jeganathan to involuntary servitude, Defendant Krishnan persuaded Ms. Jeganathan to enter the United States by falsely representing that Ms. Jeganathan's employment would be subject to the Second Contract.  Defendant Krishnan falsely represented that Ms. Jeganathan would receive a pay rate of $9.75 per hour, that Defendant Krishnan would not withhold Ms. Jeganathan's passport, and that Defendant Krishnan would not require Ms. Jeganathan to remain at her workplace when Ms. Jeganathan was not paid to remain there.

113.   Defendant Krishnan knowingly provided or obtained Ms. Jeganathan's services by means of physical restraint by confiscating her passport, requiring her to remain within the residence, and threatening to send her back to Sri Lanka.

114.   Defendant Krishnan threatened that if Ms. Jeganathan left the apartment, she would be vulnerable to the authorities after her visa expired.  Defendant Krishnan further threatened Ms. Jeganathan by telling her that she would be preyed upon by black people were she to leave the apartment alone.  In so doing, Defendant Krishnan engaged in a scheme to

NYACTIVE-15397936.1

cause Ms. Jeganathan to believe she had to remain in Defendant Krishnan's employ or face serious harm.

115.  As set forth in 18 U.S.C. § 1589(b), it is unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in [Section 1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means."

116.  Defendant Krishnan and Defendant Kumar knowingly benefited, financially or by receiving value, from participation in a venture which they knew or should have known engaged in violations of 18 U.S.C. § 1589, namely Ms. Jeganathan's services for minimal compensation.

117.  Ms. Jeganathan brings this claim for relief pursuant to 18 U.S.C. § 1595.

118.  As a direct and proximate result of Defendant Krishnan's and Defendant Kumar's actions, Ms. Jeganathan has suffered damages in an amount to be established at trial.

119.  Ms. Jeganathan is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. §§ 1590, 1595**

**(Against Both Defendants)**

120.  Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

121.   Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit[], harbor[], transport[], provid[e], or obtain[] by any means, any person for labor or services in violation of [the Trafficking Victims Protection Reauthorization Act]."

122.   Defendants knowingly recruited, transported, harbored, provided and/or obtained Ms. Jeganathan, bringing her to the United States through the aid of a fraudulent contract, for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. §§ 1584, 1589 and 1592, and therefore violated 18 U.S.C. § 1590.

123.   Defendants knowingly violated the prohibitions against involuntary servitude and forced labor set forth in 18 U.S.C. §§ 1584(a) and 1589(a) and (b).

124.   Ms. Jeganathan brings this claim for relief pursuant to 18 U.S.C. § 1595.

125.   As a direct and proximate result of Defendants' actions, Ms. Jeganathan has suffered damages in an amount to be determined at trial.

126.   Ms. Jeganathan is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF

**Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. §§ 1592, 1595**

**(Against Defendant Krishnan)**

127.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

128.   Pursuant to 18 U.S.C. § 1592(a), it is unlawful to "knowingly destroy[], conceal[], remove[], confiscate[], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another

20

person . . . in the course of a violation of . . . [or] with intent to violate [certain provisions under the Trafficking Victims Protection Reauthorization Act, including those prohibiting trafficking, peonage, slavery, involuntary servitude, or forced labor]; or . . . to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons."

129.    Pursuant to 22 U.S.C. § 7102(9)(B), "severe forms of trafficking in persons" includes "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

130.    Defendant Krishnan knowingly concealed, removed, confiscated, and/or possessed Plaintiff's passport in the course of a violation of and/or with the intent to violate 18 U.S.C. §§ 1584, 1589 and 1590.

131.    Defendant Krishnan knowingly confiscated, and possessed Ms. Jeganathan's passport to prevent or restrict or to attempt to prevent or restrict, without lawful authority, Ms. Jeganathan's liberty to move or to travel, in order to maintain her labor or services.

132.    At the time Defendant Krishnan restricted Ms. Jeganathan's liberty, Ms. Jeganathan was a victim of a severe form of trafficking.

133.    Ms. Jeganathan brings this claim for relief pursuant to 18 U.S.C. § 1595.

134.    As a direct and proximate result of the conduct of Defendant Krishnan, Ms. Jeganathan has suffered injuries to her person and property, and other damages.

135.    Ms. Jeganathan is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF

**Fair Labor Standards Act (FLSA) Minimum Wage Violation**
**29 U.S.C. § 201 *et seq.***

**(Against Defendant Krishnan)**

136.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.   Section 6(a) of the FLSA, 29 U.S.C. § 206(f), provides that any domestic service employee employed in one or more households who is employed more than eight hours per week shall be paid wages at the federal minimum wage rate during the period of employment.

138.   In all periods of Ms. Jeganathan's employment, she worked in Defendant Krishnan's household for more than eight hours per week.

139.   In all periods of Ms. Jeganathan's employment, Defendant Krishnan knowingly paid Ms. Jeganathan an hourly rate far less than the federal minimum wage, in violation of 29 U.S.C. §§ 206 and 216.

140.   Defendant Krishnan's failure to pay required compensation was willful within the meaning of 29 U.S.C. § 255(a).

141.   Defendant Krishnan did not act in good faith when she failed to comply with federal minimum wage law.

142.   Defendant Krishnan's willful and intentional failure to pay Ms. Jeganathan the minimum wage violates 29 U.S.C. § 201 *et seq.* and U.S. Department of Labor regulations. Ms. Jeganathan is entitled to an award of damages for unpaid minimum wages in amounts equal to the proper federal minimum wage she should have been paid, liquidated damages, attorneys' fees, and costs.

22

## SIXTH CLAIM FOR RELIEF

**New York Labor Law Minimum Wage Violation**
**N.Y. Lab. Law §§ 190 *et seq.* and 650 *et seq.***

**(Against Defendant Krishnan)**

143.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

144.   The New York Labor Law requires employers to pay a minimum hourly wage for covered employees in New York State.  N.Y. Lab. Law § 652; N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.1.

145.   At all times relevant to this action, Ms. Jeganathan was an employee covered by state minimum wage law.  N.Y. Lab. Law §§ 2, 651-652; N.Y. Comp. Codes R. & Regs., tit. 12 § 142-2.1.

146.   At all times relevant to this action, Defendant Krishnan employed Ms. Jeganathan within the meaning of New York Labor Law.  N.Y. Lab. Law §§ 2, 190 and 651.

147.   At all times relevant to this action, Defendant Krishnan was an employer within the meaning of New York Labor Law.  N.Y. Lab. Law §§ 2, 190, 651.

148.   In all periods of Ms. Jeganathan's employment, Defendant Krishnan failed to pay Ms. Jeganathan the proper minimum wage, as required by New York State law.  N.Y. Lab. Law § 650 *et seq.*

149.   Defendant Krishnan's failure to pay Ms. Jeganathan the minimum wage was willful and/or not in good faith.

150.   Ms. Jeganathan is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper state minimum wage she should have been paid, liquidated damages, attorneys' fees, and costs.

NYACTIVE-15397936.1

## SEVENTH CLAIM FOR RELIEF

**New York Labor Law Overtime Violation**
**N.Y. Lab. Law §§ 190 *et seq.* and 650 *et seq.*;**
**N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.2**

**(Against Defendant Krishnan)**

151.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.   Defendant Krishnan failed to pay Ms. Jeganathan overtime premiums for her work in excess of forty-four (44) hours per week, as required for a residential employee in violation of New York Labor Law §§ 190 *et seq.* and 650 *et seq.* and New York Department of Labor regulations, N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.2.

153.   Defendant Krishnan's failure to pay Ms. Jeganathan overtime pay was willful and/or not in good faith.

154.   Ms. Jeganathan is entitled to an award of damages for overtime pay for work over forty-four (44) hours per week in an amount equal to the proper overtime premiums she should have been paid, liquidated damages, attorneys' fees, and costs.

## EIGHTH CLAIM FOR RELIEF

**New York Labor Law Spread-of-Hours Pay Violation**
**N.Y. Lab. Law §§ 190 *et seq.* and 650 *et seq.*;**
**N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.4**

**(Against Defendant Krishnan)**

155.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.   Defendant Krishnan failed to pay Ms. Jeganathan an extra hour's pay for every day that she worked in which the interval between her start and end time exceeded ten hours, in

24

violation of New York Labor Law §§ 190 *et seq.* and 650 *et seq.* and New York State Department of Labor regulations, N.Y. Comp. Codes R. & Regs., tit. 12, § 142-2.4.

157.   Defendant Krishnan's failure to pay Ms. Jeganathan spread-of-hours pay was willful and/or not in good faith.

158.   Ms. Jeganathan is entitled to an award of an extra hour's pay for every day that she worked in excess of ten hours, liquidated damages, attorneys' fees, and costs.

### NINTH CLAIM FOR RELIEF

**New York Labor Law Frequency of Payment Violation**
**N.Y. Lab. Law § 191(1)(a)(i)**

**(Against Defendant Krishnan)**

159.   Plaintiff realleges and incorporates each and every allegation contained in the above paragraphs as if fully set forth herein.

160.   New York Labor Law requires employers to pay manual laborers each week. N.Y. Lab. Law § 191(1)(a)(i).

161.   Ms. Jeganathan did not receive payment of wages within seven calendar days after the end of the week in which the wages were earned, in violation of New York Labor Law § 191(1)(a)(i).

162.   Defendant Krishnan's failure to pay the promised wages with lawful frequency was willful and/or not in good faith.

163.   Ms. Jeganathan is entitled to any underpayment suffered, liquidated damages, and attorneys' fees and costs.

## TENTH CLAIM FOR RELIEF

### New York Labor Law Notice and Record-Keeping Violation
### N.Y. Lab. Law § 195

### (Against Defendant Krishnan)

164.   Plaintiff realleges and incorporates each and every allegation contained in the above paragraphs as if fully set forth herein.

165.   Employers are required to provide, at the time of hire "the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances," among other things.  N.Y. Lab. Law § 195(1)(a). This notice must be given in the employee's primary language. *Id.*

166.   Employers must obtain and preserve for six years written acknowledgement that such notice was provided. *Id.*

167.   Employers are also required to "furnish each employee with a statement with every payment of wages, listing the . . . rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission or other; gross wages; deductions; allowances, if any" among other things. *Id.* § 195(3).

168.   Defendant Krishnan failed to provide Ms. Jeganathan the notice of her rights upon hire and wage statements that complied with New York Labor Law.  Defendant Krishnan failed to obtain written acknowledgement from Ms. Jeganathan of notice.

169.   Defendant Krishnan's failure to provide Ms. Jeganathan notice of her rate of pay and legally adequate wage statements was willful and not in good faith.

170.    Ms. Jeganathan is entitled to damages of fifty dollars for each work week that she did not receive the notice required by New York Labor Law § 195(a)(1), attorneys' fees and costs, together not to exceed $2,500, and injunctive and declaratory relief. *Id.* § 198(1-b).

171.    Ms. Jeganathan is entitled to damages of one hundred dollars for each work week that she did not receive the notice required by New York Labor Law § 195(a)(3), attorneys' costs and fees, together not to exceed $2,500 and injunctive and declaratory relief. *Id.* § 198(1-d).

## ELEVENTH CLAIM FOR RELIEF

### New York Labor Law Failure to Pay Promised Wages
### N.Y. Lab. Law § 190 *et seq.*

### (Against Defendant Krishnan)

172.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

173.    The New York Labor Law requires employers to pay promised wages for every hour worked. N.Y. Lab. Law §§ 190, 191 *et seq.*

174.    Defendant Krishnan failed to pay Ms. Jeganathan the promised wage of $9.75 per hour and the corresponding overtime rate for hours over forty-four (44) per week, at $14.63 per hour.

175.    Defendant Krishnan's failure to pay Ms. Jeganathan the promised wages was willful and/or not in good faith.

176.    Ms. Jeganathan is entitled to her promised wages, liquidated damages, attorneys' fees and costs.

NYACTIVE-15397936.1

## TWELFTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Defendant Krishnan)

177.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.   Defendant Krishnan created a legally enforceable agreement with Ms. Jeganathan through the contract that she submitted to the U.S. Embassy in Malaysia in order to obtain Ms. Jeganathan's A-3 visa.

179.   Ms. Jeganathan and Defendant Krishnan entered into a written agreement in which Ms. Jeganathan agreed to work for Defendant Krishnan, and Defendant Krishnan agreed to pay Ms. Jeganathan $9.75 per hour, pay Ms. Jeganathan overtime pay, pay Ms. Jeganathan if she was told to remain in the home following working hours, and allow Ms. Jeganathan access to her passport, among other promises.

180.   The document signed by Ms. Jeganathan and Defendant Krishnan reflected the hours of work and pay rate to which the parties had agreed.

181.   Ms. Jeganathan fully performed under the contract by working as a domestic employee for Defendant Krishnan.

182.   Defendant Krishnan breached numerous provisions of the written contract, including by failing to pay Ms. Jeganathan the full amount due under the contract each month, by failing to provide Ms. Jeganathan time off, by confiscating Ms. Jeganathan's passport and refusing her access to it, and by failing to pay Ms. Jeganathan by check or wire transfer.

183.   As a direct and proximate result of Defendant Krishnan's actions, Ms. Jeganathan has suffered harm.

184.   Plaintiff is entitled to recover damages in an amount to be proven at trial.

NYACTIVE-15397936.1

## THIRTEENTH CLAIM FOR RELIEF

### Fraud

### (Against Defendant Krishnan)

185.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

186.   As alleged herein, Defendant Krishnan made false representations of material fact, intentionally and knowingly, to mislead Ms. Jeganathan to accept work as a domestic servant for Defendant Krishnan in the United States.

187.   Defendant Krishnan made false representations of material fact to Ms. Jeganathan prior to Ms. Jeganathan's second interview at the U.S. Embassy in Malaysia.  Such misrepresentations included the signing of a fraudulent agreement and instructing Ms. Jeganathan to answer questions accordingly during her U.S. Embassy interview.  On information and belief, Defendant Krishnan provided the fraudulent agreement to the U.S. Embassy in Malaysia.

188.   Defendant Krishnan knew the statements contained in the agreement as well as the oral representations that she made to Ms. Jeganathan and to the U.S. Embassy were false.

189.   Defendant Krishnan had no intention of fulfilling the obligations set forth in the agreement.

190.   Defendant Krishnan knowingly and intentionally made such representations with the purpose of misleading Ms. Jeganathan to believe that her working conditions would improve in the United States under her A-3 visa, so as to obtain Ms. Jeganathan's passage to the United States and then confine her to work long hours for insufficient wages.

NYACTIVE-15397936.1

191.   Ms. Jeganathan justifiably relied on Defendant Krishnan's representations and reasonably believed that she could increase her income so as to provide more money to her family by working in the United States.

192.   As a direct and proximate result of Defendant Krishnan's misrepresentations, Ms. Jeganathan suffered emotional, psychological, and economic harm.

193.   Ms. Jeganathan is entitled to recover damages in an amount to be determined at trial, including punitive damages.

## PRAYER FOR RELIEF

194.   Based on the allegations set forth above and/or additional facts that will be revealed through discovery, Plaintiff respectfully requests that this Court grant the following relief, in amounts to be determined at trial, on each count detailed above:

1. Declaring that Defendants violated the Fair Labor Standards Act, the New York Labor Law, and the Trafficking Victims Protection Act of 2000 and subsequent Trafficking Victims Protection Reauthorization Acts;

2. Awarding an injunction prohibiting further retaliation of any kind based on this lawsuit;

3. Awarding Plaintiff restitution in the full amount of her losses, punitive and compensatory damages for pain and suffering, attorneys' fees and costs, and such other relief as the Court may deem just and proper pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. §§ 1593, 1595;

4. Awarding Plaintiff unpaid minimum wages in an amount equal to the federal minimum wage she should have been paid, liquidated damages, and attorneys' fees, and costs, pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*;

NYACTIVE-15397936.1

5. Awarding Plaintiff unpaid wages, including promised wages, minimum wages, overtime pay, and spread-of-hours pay, plus liquidated damages, interest, attorneys' fees and costs, pursuant to New York Labor Law § 190, *et seq.*;

6. Awarding Plaintiff the value of the terms of the contract as common law requires;

7. Awarding plaintiff pre-judgment and post-judgment interest as allowed by law;

8. Awarding Plaintiff other legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

196. Plaintiff hereby demands a trial by jury.

Dated:   New York, New York
         August 25, 2016

Respectfully submitted,

**THE LEGAL AID SOCIETY**
Seymour W. James, Jr., *Attorney-in-Chief*
Adriene Holder, *Attorney-in-Charge, Civil Practice*
Karen Cacace, *Director, Employment Law Unit*
Sumani V. Lanka, *Of Counsel*
199 Water Street, 3rd Floor
New York, New York 10038
Telephone: (212) 577-3300

                    *and*

 /s/ Glen G. McGorty
Glen G. McGorty
Anne E. Li
Ethan W. Simonowitz
Jared A. Levine
CROWELL & MORING LLP

31

590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 895-4246

*Attorneys for Plaintiff Parimaladevi Jeganathan*